UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

HARRY T. ANDERSON,                :
                                  :
     Plaintiff,                   :
                                  :
v.                                :    Case No. 3:12-CV-00785 (RNC)
                                  :
EASTERN CONNECTICUT HEALTH        :
NETWORK, INC. a/k/a ECHN, INC.:
and EASTERN CONNECTICUT           :
MEDICAL PROFESSIONALS             :
FOUNDATION, INC. f/k/a ECHN       :
HEALTH SERVICES, INC.,            :
                                  :
     Defendants.                  :

RULING AND ORDER

Plaintiff Harry T. Anderson brings this case against

defendants Eastern Connecticut Health Network, Inc. ("ECHN") and

ECHN Health Services, Inc. ("Health Services").  Dr. Anderson, a

surgeon, alleges that by failing to accommodate his disability

and terminating his employment, defendants violated the Americans

with Disabilities Act ("ADA"), the Age Discrimination in

Employment Act ("ADEA") and the Connecticut Fair Employment

Practices Act ("CFEPA").  Dr. Anderson also brings a state law

claim for negligent infliction of emotional distress ("NIED").

The parties have filed cross-motions for summary judgment.

Dr. Anderson has moved for partial summary judgment on his ADA

and CFEPA claims, and the defendants have moved for summary

judgment on all the claims.  For reasons that follow, I conclude

that the defendants are entitled to summary judgment on the

claims under the ADA, ADEA and CFEPA.  In light of this
disposition, I decline to exercise supplemental jurisdiction over
the NIED claim.

I. <u>Background</u>

The defendants own and operate Manchester Memorial Hospital,
where Dr. Anderson maintained an independent medical practice for
more than twenty-five years.  During this time he held privileges
to practice general surgery, as well as a number of surgical
specialties.  ECF No. 146, at 2; ECF No. 151, ¶ 14.

In late 2009, Dr. Joel Reich, ECHN's Chief Medical Officer,
received several reports regarding Dr. Anderson's conduct that
caused him concern.  Dr. Anderson seemed unsure of himself during
surgery, was unkempt in appearance, and at times appeared to be
in a "stupor-like state."  ECF No. 151, ¶ 19.  Dr. Anderson's
psychiatrist, Dr. Lori Calabrese, told the Hospital that these
problems probably were due to medication Dr. Anderson was taking
for depression.  She adjusted his prescription, his condition
improved, and by March 2010 the issue had been resolved.  <u>Id</u>. at
¶ 23.

Some five months later, in August 2010, Dr. Anderson sold
his practice to ECHN.  Health Services, ECHN's wholly owned
subsidiary, hired him as a general surgeon and Chair of the
Hospital's Department of Surgery.  ECF No. 146, at 5; ECF No.
151, ¶ 31.  Under the employment agreement, Health Services

assumed the lease on Dr. Anderson's office space, hired his existing staff, and began to pay his medical malpractice premiums.  ECF No. 151, ¶¶ 26-27.

As a general surgeon employed by Health Services, Dr. Anderson was required to maintain medical staff privileges.  Id. at ¶ 2.  At ECHN hospitals, the ECHN Board of Trustees controls the granting of medical privileges.  In matters relating to privileges the Board is advised by the Medical Executive Committee ("MEC"), a body comprised of a number of ECHN doctors, which governs ECHN medical staff.  ECF No. 146, at 2; ECF No. 151, ¶¶ 4-5.

Soon after Dr. Anderson's hiring, Dr. Reich became aware of new reports concerning his conduct and appearance.  Dr. Reich was told that Dr. Anderson sometimes seemed confused and shaky, slurred his speech and mumbled, wore dirty clothes and had toothpaste on his face while seeing patients.  In the span of two weeks, two of Dr. Anderson's patients experienced unusual post-operative bleeding.  During one surgery, Dr. Anderson repeatedly sutured his own glove, and before another he nearly marked the wrong side of the patient for incision.  ECF No. 151, ¶ 38.

In October 2010, Hospital officials met with Dr. Anderson to discuss these concerns.  The record discloses neither the substance of the discussion nor what (if anything) the Hospital did to remedy the situation.  ECF No. 151, ¶ 39; ECF No. 169-1, ¶

3

39.  But new reports surfaced in the following months.  Dr. Reich was told that Dr. Anderson had mocked a physician's assistant during surgery, was difficult to reach when on emergency call, and had appeared in the Hospital late at night, disoriented and smelling of alcohol.  ECF No. 151, ¶¶ 41, 43.

On January 14, 2011, Dr. Anderson discussed these reports in a meeting with Dr. Reich and two other Hospital officials, Drs. David Neuhaus and Anthony DiStefano.  Dr. Reich suggested it might be profitable if Dr. Anderson took a medical leave of absence or stopped taking emergency call.  ECF No. 169-1, ¶ 45. The four also discussed whether Dr. Anderson might wish to retire.  ECF No. 151, ¶ 45.  But Dr. Anderson denied that any medical condition prevented him from performing his duties, and the meeting adjourned without a resolution.  ECF No. 169-1, ¶ 46.

Soon after the meeting, Dr. Reich was informed that one of Dr. Anderson's recent surgeries had gone poorly.  According to the report, Dr. Anderson had experienced serious back pain during the procedure, and the anesthesiologist had given him an injection of painkillers with the patient on the table.  Dr. Anderson, seeking an access point and unable to find one, had stuck the patient a number of times, causing her considerable pain.  ECF No. 169-1, ¶ 47; ECF No. 151, ¶ 47; ECF No. 151, Ex. 17.  At a meeting on January 17, Drs. Reich and DiStefano discussed the incident with Dr. Anderson and again suggested he

take a leave of absence.  Dr. Anderson agreed.  On January 19, he requested and was granted sixty days of paid leave from both medical staff privileges and employment.  ECF No. 151, ¶¶ 49, 51.

As a condition of his leave, Dr. Anderson agreed to submit to an evaluation of his physical and cognitive abilities.  His return was conditioned on a satisfactory showing.  Id. at ¶ 52. For this reason he sought the assistance of the Health Assistance InterVention Education Network ("HAVEN"), an organization that "evaluate[s] physicians with potential impairment" and provides them support.  Id. at ¶ 55.  Dr. Anderson signed a contract with HAVEN stating he would not return to practice without its endorsement.  Id. at ¶ 56.

Dr. Anderson commenced treatment and evaluation.  By March 7, 2011, he thought his depression sufficiently controlled to permit his return to work without the need for accommodation. Id. at ¶ 57.  Dr. Calabrese shared this opinion.  She attributed Dr. Anderson's pre-leave behavior to his depression and several of his medications and believed these issues had been resolved during his period of leave.  Id. at ¶ 58.

On March 18, however, Drs. Reich and Neuhaus received HAVEN's separate evaluation.  In HAVEN's judgment, Dr. Anderson was not ready to return to the operating room because testing had revealed his motor skills to be on the low end of average.  It recommended he return to office work under the observation of a

practice monitor who would watch for signs of behavioral problems or substance abuse. Id. at ¶ 65.

Because Dr. Anderson could not resume his full range of surgical duties without HAVEN's approval, defendants permitted him to extend his leave through use of his accumulated paid time off. In the weeks that followed, defendants, Dr. Anderson and HAVEN discussed the possible terms of Dr. Anderson's return to work. In late April, HAVEN suggested that Dr. Anderson could return to surgery, but only under the supervision of a proctor. HAVEN agreed to defer to the MEC's judgment concerning the length and terms of the proctoring. Id. at ¶ 83.

In late April, the MEC voted to adopt a plan dated May 4 (the "May Plan") governing Dr. Anderson's resumption of duties. Under the May Plan, Dr. Anderson would take no emergency calls and initially would perform only relatively straightforward surgery. A proctor, who would pre-approve cases and scrub in during surgery if necessary, would monitor his performance until the MEC determined proctoring was no longer needed. Id. at ¶ 89; ECF No. 146, at 8.

Dr. Anderson thought the May Plan unacceptable on several grounds. In his opinion, for instance, the range of surgeries permitted under the Plan was too limited. ECF No. 151, ¶ 92; ECF No. 210, at 15. Dr. Anderson voiced his concerns, and during the month of May he and HAVEN continued to negotiate with ECHN, which

was "amenable to reconsidering" the Plan's terms.  ECF No. 210, at 16.

Despite the continuing dialogue, Dr. Anderson gave notice that he was appealing the May Plan.  ECF No. 147, ¶ 177.  The parties' initial moving papers do not disclose with perfect clarity the point of contention that, in Dr. Anderson's view, rendered the May Plan unacceptable.  But oral argument, a telephone conference and a round of supplemental briefing have since clarified this issue: Dr. Anderson objected to ECHN's proposed course of action because it would have been reported to the National Practitioner Data Bank ("NPBD").  See ECF No. 210, at 4-5; ECF No. 209, at 2-3 ("HAVEN made these recommendations because the Medical Review Committee recognized a mandatory report to the NPDB was not necessary, but as proposed the Defendants' performance improvement plan would require it.").

This point requires some elaboration.  The NPDB was created by the Secretary of Health and Human Services ("HHS") under the authority of the Health Care Quality Improvement Act of 1986 ("HCQIA"), 42 U.S.C. § 11101 et seq.  45 C.F.R. § 60.1.  It houses information relating to medical malpractice payments and disciplinary actions taken by hospitals and other healthcare entities.  Id.  Under the HCQIA, a hospital that undertakes a "professional review action[] related to professional competence or conduct" that adversely affects a doctor's clinical privileges

7

for more than thirty days must report the action to the Board of
Medical Examiners.  42 U.S.C. § 11133(a)(1)(A).  The information
is in turn transmitted to HHS and published in the NPDB.  42
U.S.C. § 11134(b).  The parties do not dispute that a reported
disciplinary action affects (indeed, is designed to affect) a
physician's reputation and professional prospects.

According to Dr. Anderson and HAVEN, the May Plan was a
reportable event because its proctoring requirement was
indefinite in duration: the proctoring period would not end until
the MEC determined it should.  ECF No. 151, ¶ 89.  In late May,
Dr. Anderson submitted an alternative proposal.  It was similar
in many respects to the May Plan.  But rather than serving under
a proctor indefinitely, Dr. Anderson would act as an assistant
surgeon for thirty days, then operate as a primary surgeon – but
only in the presence of a "preceptor" surgeon – for another,
initial thirty-day period.  Id. at ¶ 99.  The "preceptor"
requirement would then be renewed in successive thirty-day
increments as the MEC thought necessary.  Id. at ¶ 100.  Dr.
Anderson's proposal did not impose a limit on the actual period
of time during which he would operate under a "preceptor";
monitoring would continue until he could safely return to full
privileges.  Id.  But because it was structured as a series of
thirty-day restrictions, instead of one indefinite restriction,
Dr. Anderson's proposed plan would not have required reporting to

8

the NPDB.  ECF No. 209, at 2.

ECHN did not agree to adopt Dr. Anderson's plan.  Peter Karl, ECHN's CEO, aware that Dr. Anderson had appealed the May Plan and would not return to full privileges during the potentially lengthy appellate process, terminated his employment on June 2, 2011.  ECF No. 151, Ex. 15, at 37.

Despite Dr. Anderson's termination, the parties continued to discuss potential plans for his return to practice.  On June 22, the MEC notified Dr. Anderson it had revised the May Plan.  Under its new proposal (the "June Plan"), Dr. Anderson would serve as an assistant for thirty days and, if he performed satisfactorily, begin practicing as a primary surgeon thereafter.  As a primary surgeon, he would practice under a proctor until the MEC decided one was no longer needed.  ECF No. 151, ¶ 107.  The June Plan did not adopt Dr. Anderson's desired structure – that is, a series of restrictions each no longer than thirty days.  It therefore required reporting to the NPDB, so Dr. Anderson appealed it.  ECF No. 169-1, at ¶ 108.

In January 2013, ECHN's Ad Hoc Committee decided Dr. Anderson's appeal.  It determined that the open-ended proctoring period imposed by the MEC was unnecessary and imposed a sixty-day proctoring period instead.  The sixty-day period was split into two thirty-day halves.  During the first, Dr. Anderson would act as an assisting physician; during the second, he would act as a

primary physician under a proctor's supervision.  ECF No. 147, ¶
234.  The terms of the June Plan were confirmed in all other
respects.  Dr. Anderson accepted the Ad Hoc Committee's decision.

Dr. Anderson brings claims under Titles I and III of the
ADA.  His Title I claim, brought against both ECHN and Health
Services, alleges that defendants failed to accommodate his
disability (i.e. his depression), by imposing onerous
requirements on his return to medical practice, and refused to
engage in an interactive, good-faith dialogue before terminating
his employment because of his disability.  Dr. Anderson's Title
III claim is brought against ECHN alone and asserts that ECHN's
failure to make reasonable modifications to its policies
prevented him from returning to full clinical privileges.  Dr.
Anderson also brings a claim under the ADEA, arguing that
defendants discriminated against him because of his age, and
state law claims alleging negligent infliction of emotional
distress and violations of the CFEPA.[1]  Dr. Anderson has moved
for summary judgment on his disability discrimination claims
under the ADA and CFEPA.  Defendants have moved for summary
judgment on all claims.

II. Discussion

On a motion for summary judgment, the Court's role is to

---

[1]Dr. Anderson's CFEPA claims parallel his ADA and ADEA
claims.

determine whether the record presents triable issues of fact.
Summary judgment should be granted if "the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(a).  A fact is "material" if it influences the case's
outcome under governing substantive law, and a dispute is
"genuine" if a reasonable jury could resolve it in the non-
movant's favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,
247-48, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).  The Court must
view the record in the light most favorable to the party opposing
summary judgment, resolving factual disputes and drawing all
reasonable inferences in favor of the non-movant.  <u>Gallo v.
Prudential Residential Servs. Ltd. P'ship</u>, 22 F.3d 1219, 1223 (2d
Cir. 1994).

A. <u>Disability Discrimination Under the ADA and CFEPA</u>

     Title I of the ADA prohibits discrimination by covered
entities "against a qualified individual on the basis of
disability in regard to job application procedures, the hiring,
advancement, or discharge of employees . . . and other terms,
conditions, and privileges of employment."  42 U.S.C. § 12112(a).
A Title I plaintiff makes out a *prima facie* case by showing that
(1) his employer is subject to the ADA; (2) he is disabled within
the meaning of the statute; (3) he is otherwise qualified to
perform the essential functions of his job, with or without

reasonable accommodation; and (4) he suffered an adverse employment action because of his disability.  Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006).

An employer's failure to provide reasonable accommodations for a disabled employee qualifies as discrimination under the ADA.[2]  McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013).  A plaintiff proceeding on a failure-to-accommodate theory must show that (1) he is a person with a disability within the meaning of the ADA; (2) his employer is covered by the statute and had notice of the disability; (3) he is able to perform the essential functions of  job with reasonable accommodation; and (4) the employer has refused to make such accommodations.  Id. at 125-26.  A Title I plaintiff "bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment" and bears a "light" burden of production as to the accommodation's facial reasonableness. McBride v. BIC Consumer Prods. Mfg. Co., Inc., 583 F.3d 92, 97, 97 n.3 (2d Cir. 2009).

Similarly, Title III of the ADA, which applies to "place[s] of public accommodation," proscribes discrimination against individuals "on the basis of disability in the full and equal

---

[2]The CFEPA imposes the same requirement on employers and borrows the ADA's framework.  Curry v. Allan S. Goodman, Inc., 944 A.2d 925, 940, 286 Conn. 390 (2008).

enjoyment of . . . goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(a). The statute defines "discrimination" to include "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities," unless the entity can demonstrate that the requested modification would "fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii). Just as a Title I plaintiff must demonstrate the existence of an accommodation that will permit her to perform the essential functions of her job, a Title III plaintiff must show that she "requested a modification and that the modification sought is reasonable." Alumni Cruises, LLC v. Carnival Corp., 987 F. Supp. 2d 1290, 1305 (S.D. Fla. 2013).

Though the ADA requires covered employers to offer reasonable accommodations and places of public accommodation to offer reasonable modifications, the statute does not entitle a plaintiff to her accommodation or modification of choice. Under Title I, an employee who rejects an employer's offer of a reasonable accommodation "will not be considered a qualified individual with a disability." E.E.O.C. v. Yellow Freight Sys., Inc., No. 98 Civ. 2270 (THK), 2002 WL 31011859, at *21 (S.D.N.Y.

13

Sept. 9, 2002) (internal quotation marks omitted); see also
Bielski v. Green, 674 F. Supp. 2d 414, 425 (W.D.N.Y. 2009) ("In
short, if the evidence shows conclusively that the employer
offered a reasonable accommodation, then the employer is entitled
to summary judgment.").  Likewise, a Title III plaintiff may
insist on a reasonable modification, but not her preferred one.
A place of public accommodation that offers a reasonable
modification has not "fail[ed] to make [a] reasonable
modification[]" under the statute, even if the plaintiff prefers
a different modification.  42 U.S.C. § 12182(b)(2)(A)(ii); Bird
v. Lewis & Clark College, 303 F.3d 1015, 1021 (9th Cir. 2002)
("The College did not necessarily fail to make reasonable
modifications simply because some aspect of the program did not
conform to Bird's expectations."); Alumni Cruises, 987 F. Supp.
2d at 1307 ("[U]nder the ADA, an individual with a disability is
not entitled to the modification of her choice, but only to a
reasonable modification." (internal quotation marks omitted));
Coleman v. Phoenix Art Museum, No. 08 Civ. 1833 (PHX) (JAT), 2009
WL 1097540, at *3 (D. Ariz. April 22, 2009) (plaintiff was not
entitled to insist he be permitted to use his preferred "hip
chair" when art museum offered him use of a wheelchair, a
reasonable modification); Dahlberg v. Avis Rent-a-Car Sys., Inc.,
92 F. Supp. 2d 1091, 1108 (D. Colo. 2000).

     Defendants offer a number of theories to support their

argument that summary judgment should enter on Dr. Anderson's ADA and CFEPA claims.  They argue that the Title I claims should fail because Dr. Anderson was unable, with or without reasonable accommodation, to perform his essential employment functions; his depression did not actually require accommodation; and he cannot show he was terminated because of his disability.  The Title III claims should fail, defendants argue, because Dr. Anderson's disability did not require any modifications; the proposed modifications would have "fundamentally altered" the nature of his privileges; and accommodating him would have posed a "direct threat to the health or safety of others."[3]  Finally, defendants argue that summary judgment should enter on the ADA claims because their plan to return Dr. Anderson to work, which he rejected, was a reasonable accommodation under Title I and a reasonable modification under Title III.  On this last ground I agree with defendants.  I therefore need not reach their other arguments.

Determining whether a given modification (or accommodation) is "reasonable" is generally an intensely factual inquiry. Thompson v. New York City Dep't of Probation, 348 Fed. Appx. 643,

---

[3]Title 42 U.S.C. § 12182(b)(3) reads: "Nothing in this subchapter shall require an entity to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of such entity where such individual poses a direct threat to the health or safety of others."

645 (2d Cir. 2009).  But as will be discussed in greater detail below, this case presents an unusual set of facts.  In these atypical circumstances, the Court is able to conclude that defendants' proffered modification was reasonable as a matter of law.

To briefly recap the relevant events, in May 2011, the defendants offered the first of two modifications designed to facilitate Dr. Anderson's return to full privileges and employment.  The May Plan prohibited him from taking emergency calls, circumscribed the range of surgeries he could perform, and provided for a proctor who would pre-approve cases and scrub in during surgery if needed.  Proctoring would continue until the MEC decided it was no longer necessary.  ECF No. 151, ¶ 89; ECF No. 146, at 8.  Dr. Anderson objected to the May Plan, and the MEC suggested a new plan in June.  Under the June Plan, Dr. Anderson would serve as an assistant surgeon for thirty days, then practice as a primary surgeon under a proctor until the MEC thought him ready to operate alone.  ECF No. 151, ¶ 107.  Dr. Anderson ultimately accepted the Ad Hoc Committee's modification to the June Plan, under which his sixty-day proctoring period was divided into two thirty-day portions.  ECF No. 147, ¶ 234.

As Dr. Anderson has made clear, he appealed defendants' May and June Plans because their structure required that they be reported to the NPBD.  So far as the record discloses, Dr.

16

Anderson did not object to the Plans and lodge appeals because
the Plans were objectionable on their own terms.  The sticking
point was the collateral consequence of NPDB reporting.  ECF No.
209, at 3 ("Defendants were aware of [Dr. Anderson's] objection
to the performance improvement plan because it required mandatory
reporting to the NPDB and the state Department of Public
Health."); id. at 2-3 ("HAVEN made these recommendations because
the Medical Review Committee recognized a mandatory report to the
NPDB was not necessary, but as proposed the Defendants'
performance improvement plan would require it."); ECF No. 210, at
7 ("And that was why Dr. Anderson challenged it to an ad hoc
committee of the Medical Executive Commitee, because the
surveillance of Dr. Anderson with regard to his ability to
practice in the surgical suite was open-ended. . . . [L]eaving
[the proctoring requirement] open-ended subjected Dr. Anderson to
a report to the National Practitioner Database . . . .").
Consistent with his resistance to NPDB reporting, in May 2011 Dr.
Anderson proposed that he operate under a "preceptor" surgeon in
renewable thirty-day increments.  ECF No. 151, ¶¶ 99-100.  Dr.
Anderson's plan did not differ in substance from the defendants'
proposals: there is no meaningful distinction between proctoring
in thirty-day increments (renewable until the MEC thought it
unnecessary) and indefinite proctoring (in place until the MEC
thought it unnecessary).  The sole difference between the plan

Dr. Anderson proposed and the plan defendants offered was that Dr. Anderson's was structured to avoid NPDB reporting, and defendants' was not.

The question for the Court, then, is this: Can a modification or accommodation proposed by a health care entity, otherwise reasonable in all its particulars, become unreasonable for the sole reason that its structure requires the entity to report it under the HCQIA?  Put another way, can the ADA ever mandate that a health care entity tailor its actions specifically to avoid its reporting obligations?  I conclude that the answer must be no.

Dr. Anderson offers no authority for the proposition that the ADA required the defendants to affirmatively sidestep the HCQIA.  This is unsurprising.  Congress enacted the HCQIA in response to the "medical malpractice crisis" of the early 1980s. Howard S. Wolfson et al., Statutory Immunity for Reports Filed with the National Practitioner Data Bank – What Is "Accurate" Reporting for Purposes of Immunity?, 18 No. 6 HEALTH LAW. 24, 24 (Aug. 2006).  The creation of the NPDB was central to Congress's statutory scheme: NPDB reporting aims to ensure that hospitals and state medical boards receive critical information about the physicians they employ and license.  In Congress's judgment, any "professional review action[] related to professional competence or conduct" that adversely affects privileges for more than

thirty days bears sufficiently on a physician's credentials to require reporting.  42 U.S.C. § 11133(a)(1)(A).  Congress thought reporting so important to the HCQIA that it immunized health care entities against suits arising out of reports made in good faith, 42 U.S.C. § 11137(c), offered a more limited form of immunity for professional review bodies and their members in suits arising out of professional review actions, 42 U.S.C. § 11111(a)(1), and authorized sanctions against health care entities that fail to observe their reporting obligations, 42 U.S.C. § 11133(c)(1).

In light of the HCQIA and its important purposes, I cannot endorse the suggestion that the ADA may require a health care entity to structure a modification so as to avoid NPDB reporting. Congress, after all, authored the ADA, just as it authored the HCQIA.  It cannot reasonably be supposed that these two statutes are in such tension that a hospital can obey one only by executing a delicate end-run around the other.  By encouraging (indeed, obligating) health care entities to avoid reporting through the creative structuring of discipline, the ADA envisioned by plaintiff would undermine the interests served by the HCQIA.

In May 2011, the parties agreed that Dr. Anderson should operate only under supervision.  Both sides agreed that an appropriate modification would affect his privileges for more than thirty days, an event which requires NPDB reporting (unless

artfully crafted to avoid it).  Defendants proposed that the period of supervision run in one unbroken chunk; Dr. Anderson proposed that it occur in thirty-day increments.  It is understandable that the difference between these proposals - whether NPDB reporting would be required - mattered to Dr. Anderson.  But as a matter of law it does not matter under the ADA.  If Dr. Anderson's proposal was reasonable – and according to him, it was – so was defendants'.

Because the defendants' proposal was reasonable, Dr. Anderson cannot prevail on his disability discrimination claims. With regard to the claim under Title III, by offering Dr. Anderson a reasonable modification, ECHN did not "fail[] to make reasonable modifications in policies, practices, or procedures" required by the statute.  See 42 U.S.C. § 12182(b)(2)(A)(ii). With regard to Title I, an employee who rejects a "reasonable accommodation . . . that is necessary to enable [him] to perform the essential functions of [his] position" and who "cannot, as a result of that rejection, perform the essential functions of the position" cannot be considered "qualified," 29 C.F.R. § 1630.9(d), and only "qualified" individuals may recover.  See 42 U.S.C. § 12112(a).  Once Dr. Anderson made it known that he would appeal any plan that required NPDB reporting, the defendants were entitled to terminate his employment instead of waiting twenty-one months for an appeal to be concluded (during which time, it

is undisputed, Dr. Anderson would perform none of the essential functions of his position).  And a reasonable accommodation having been offered and rejected, they were not obliged to participate in a "good-faith interactive process" aimed at generating a different one.

Accordingly, summary judgment will enter for the defendants on the ADA and CFEPA disability discrimination claims and Dr. Anderson's motion for summary judgment on these claims will be denied.

B. Age Discrimination Under the ADEA and CFEPA

Age discrimination claims under both the ADEA and CFEPA are analyzed using McDonnell Douglas burden-shifting.  A plaintiff makes out a *prima facie* case by showing that (1) he was within the protected age group; (2) he was qualified for the position; (3) he was discharged; and 4) the discharge occurred under circumstances giving rise to an inference of age discrimination. Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000).  If the plaintiff makes this showing, the employer must "offer a legitimate, nondiscriminatory business rationale for its actions."  Id.  If the employer can identify such a reason, it is the plaintiff's burden to show that the real reason for the discharge was age discrimination.[4]

---

[4]Under the ADEA, plaintiff must show that age was the but-for cause of his termination.  Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176, 129 S. Ct. 2343, 174 L.Ed.2d 119 (2009).

Defendants argue that Dr. Anderson has failed to show that he was qualified for his position or that his discharge occurred under circumstances giving rise to an inference of discrimination.  They also argue that even if Dr. Anderson has satisfied all the elements of a *prima facie* case, he cannot carry his ultimate burden of showing that his discharge was motivated by age discrimination.  I agree on this last point and therefore do not consider defendants' other arguments.

Even if Dr. Anderson presents a *prima facie* case – a point the Court will assume – that case is very weak.  The evidence tending to support an inference of discrimination amounts only to this: during meetings in January and May 2011, defendants' agents discussed with Dr. Anderson the possibility of his retiring.  Plaintiff identifies no case holding that so slim a reed can bear an inference of age discrimination, and the precedent is to the contrary.  See Hamilton v. Mt. Sinai Hosp., 528 F. Supp. 2d 431, 447 (S.D.N.Y. 2007) ("[C]ases that have found references to retirement to be significant involved other indicia of an improper animus.").  Nonetheless, the Court assumes a jury could

---

Plaintiff points out that at least one Connecticut court has held that Gross does not alter the CFEPA's longstanding standard, which requires a plaintiff to show only that age was a "motivating factor" in the discharge.  See Wagner v. Bd. of Trustees for Conn. State Univ., No. HHDCV085023775S, 2012 WL 669544, at *11–12 (Conn. Super. Jan. 30, 2012).  I will assume plaintiff to be correct; it does not alter the result discussed below.

infer from these remarks that Dr. Anderson's discharge was motivated by his age.

Defendants state that they terminated Dr. Anderson's employment because he refused to accept the MEC's restrictions on his privileges and lodged an appeal, which would prevent him from performing the basic functions of his job for an indefinite period of time.  This is a legitimate, nondiscriminatory explanation for Dr. Anderson's discharge.

The burden therefore shifts to Dr. Anderson, who must show (under the ADEA) that his age was the but-for cause of his termination or (under the CFEPA) that age was a "motivating factor" in his termination.  Dr. Anderson argues that in light of the discussions concerning his retirement, a reasonable jury could believe his version of events and disbelieve defendants'. For three reasons, I disagree.

First, as discussed above, no case has been found in which a bare reference to retirement, without more, was held to support an inference of discrimination.  Indeed, the Hamilton case, surveying the field, noted that cases involving remarks about retirement invariably involve other indicia of discriminatory animus as well.  Here, no such other indicia are present.

Second, the context in which the discussions of retirement occurred further weakens their evidentiary value.  Case law shows that context matters.  In Pitasi v. Gartner Group, Inc., 184 F.3d

23

709, 715 (7th Cir. 1999), for instance, an employee's position
was to be eliminated because of a workforce reduction.  His
employer suggested he might make his exit more "palatable" by
retiring instead of waiting to be terminated.  Id. at 715.  The
Seventh Circuit held that in context, the suggestion of
retirement did not give rise to an inference of age
discrimination.  No reasonable juror could find that the employer
was endeavoring to subtly urge the employee out of the company
because of his age rather than trying to ease his inevitable
departure from the workplace.  Id.; see also Kaniff v. Allstate
Ins. Co., 121 F.3d 258, 263 (7th Cir. 1997) (no inference of
discrimination when an employer, having learned of its employee's
fraud on the company, suggested he retire: "the possibility of
retirement was raised by Allstate officials only in order to
spare Kaniff the embarrassment of being terminated for
dishonesty").

     In this case, it is undisputed that discussions concerning
Dr. Anderson's retirement occurred in the context of his
professional struggles and leave of absence.  It is also
undisputed that in January 2011 – the same month as the first
meeting identified by plaintiff – Dr. Anderson's lawyer mentioned
to defendants' counsel that Dr. Anderson might wish to retire.[5]

_____

     [5]It is not clear whether this discussion occurred before the
meeting Dr. Anderson identifies, or after.  If before, it
vitiates the force of Dr. Anderson's evidence altogether.  But

ECF No. 151, Ex. 23 at 61 ("[Plaintiff's counsel] mentioned that this may be a situation where the physician might be – it might be time for him to retire."). In these circumstances, a reasonable juror would be compelled to conclude that defendants raised the possibility of retirement because it seemed a reasonable way to resolve a difficult situation, not because defendants wanted to get rid of Dr. Anderson because of his age.

Finally, Dr. Anderson was hired less than a year before his discharge by the same person who ultimately terminated his employment. Peter Karl, ECHN's CEO, hired Dr. Anderson in August 2010, when Dr. Anderson was 64 years old. ECF No. 151, ¶¶ 24-26. Mr. Karl discharged Dr. Anderson in June 2011, when Dr. Anderson was 65. Id. at ¶ 101. That Mr. Karl was willing to hire Dr. Anderson ten months before he fired him strongly indicates that the discharge was not motivated by age discrimination. See Schnabel v. Abramson, 232 F.3d 83, 91 (2d Cir. 2000) ("Third, Schnabel was fired by the same man who had hired him three years earlier, when Schnabel already was 60 years old. In the past, we have found this factor highly relevant . . . ."); Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997) ("[W]hen the person who made the decision to fire was the same person who

---

even if it occurred afterward, it both eliminates the evidentiary value of the May meeting and demonstrates that the circumstances reasonably suggested (to all parties involved) that retirement might be appropriate.

made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.  This is especially so when the firing has occurred only a short time after the hiring.").

I therefore conclude that no reasonable juror could find that in discharging Dr. Anderson the defendants violated either the ADEA or the CFEPA.  Accordingly, summary judgment will enter for the defendants on these counts.

C. <u>Negligent Infliction of Emotional Distress</u>

Because summary judgment is being granted to the defendants on Dr. Anderson's federal and state statutory claims, the question arises whether the Court should exercise supplemental jurisdiction over the NIED claim.  Under 28 U.S.C. § 1367(c)(3), it is proper for a federal court to decline to exercise supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction."  Whether to exercise supplemental jurisdiction rests in the court's discretion and should be decided by reference to "the values of judicial economy, convenience, fairness, and comity."  <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 349-50, 108 S. Ct. 614, 98 L.Ed.2d 720 (1988).  Once the federal claims in a case have been dismissed, "the balance of factors will 'usual[ly]' point toward a declination."  <u>Lundy v. Catholic Health Sys. of Long Island, Inc.</u>, 711 F.3d 106, 118 (2d Cir. 2013) (quoting <u>Carnegie-Mellon</u>,

484 U.S. at 350 n.7); see also 13D CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 3567.3 (3d ed. 2008)(same).

In this case, the balance tips in favor of dismissing the NIED claim without prejudice to refiling in state court especially because the claim appears to present several close legal questions.  See Dargis v. Sheahan, 526 F.3d 981, 990 (7th Cir. 2008) (court should decline to exercise supplemental jurisdiction after dismissal of federal claims unless "it is clearly apparent how the state claims are to be decided").

III. Conclusion

Accordingly, defendants' motion for summary judgment is hereby granted as to the ADA, ADEA and CFEPA claims and plaintiff's motion for partial summary judgment is denied.  The NIED claim is dismissed without prejudice.

So ordered this 16th day of July 2015.

               /s/
        Robert N. Chatigny
    United States District Judge
